No. 2009
Second Circuit Appeal

---

ARMOUR PACKING COMPANY v. WALKER PRICE OIL CO., INC.

---

(January 19, 1925, Opinion and Decree)
(March 2, 1925, Rehearing Refused)

---

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Negligence—Par. 41.**
Plaintiff, having proven that the fire which destroyed his automobile was caused by defendant's agent negligently overflowing his gasoline tank, shifted the burden of proof of contributory negligence to defendant.

2. **Louisiana Digest—Negligence—Par. 42.**
Where contributory negligence is a special defense and the evidence is conflicting, the court will not consider the contributory negligence proven.
(Civil Code, Art. 2315. Editor's note.)

Appeal from the Thirteenth District Court, Parish of Rapides. Hon. L. L. Hooe, Judge.

This is a suit to recover the value of a Ford car destroyed by fire.

There was judgment for defendant and plaintiff appealed.

Judgment reversed.

Gus A. Voltz, of Alexandria, attorney for plaintiff, appellant.

William Carter, of Alexandria, attorney for defendant, appellee.

## OPINION

CARVER, J. Plaintiff sues defendant for damages to a Ford car, alleged to have been practically destroyed by fire caused by the negligence of defendant's employee in overflowing the gasoline tank of the car while filling it with gasoline at defendant's filling station.

He charges that the gasoline ran over the side of the tank and was ignited by the exhaust pipe.

Defendant denies that the gasoline caught fire from the exhaust pipe; claims that it did so from a spark produced by a short circuit created by contact between the metal body of the car and a live electric wire on the car from which the insulation had become rubbed off; and plead the condition of the wire (of which it says plaintiff's agent knew) as contributory negligence.

Grigsby, defendant's employee, admits overflowing the tank and defendant's counsel does not pretend that this was not negligence. The case turns, then, on the plea of contributory negligence, and this depends on what set the gasoline afire— the exhaust pipe or a spark from the electric wire. On this question of facts no witness pretends to have any knowledge and the testimony consists chiefly on opinions.

The undisputed facts, including opinions, are:

That while filling the tank with gasoline Grigsby overflowed it.

That he stepped on the running board to take out the hose used in supplying the gasoline and as he did so something underneath set fire to the gasoline and the car was practically destroyed by the fire.

That the opening in the tank to receive the gasoline is on the right side of the car.

That the exhaust pipe is also on the right side and beneath the tank opening.

That the wire claimed to have been uninsulated was on the left side of the car.

That this wire had at some time before the fire become uninsulated.

That if an uninsulated live wire is brought into contact with metal it will create a short circuit and produce a spark.

That such spark will ignite the vapor from gasoline.

That the exhaust pipe slopes downward from the engine back.

That gasoline vaporizes at 120 to 125 degrees.

Though to some extent disputed by Grigsby, a school boy, we think the testimony of R. E. Hearn (with 8½ or 9 years' experience as automobile mechanic, confined to Ford cars) establishes the fact that, from running the exhaust pipe of a Ford car will get red hot up to a point about 16 or 18 inches from the front of the tank.

On the question whether gasoline will ignite from a red hot iron the experts differ.

E. M. Telle, with ten years' experience as manufacturer of petroleum products, says (Trs. page 4):

"Q. In your opinion, if an exhaust pipe of an automobile that has been heated to a high point should come in contact with gasoline, would you say that that gasoline would explode or would not explode?
"A. Yes, sir, one will ignite from two causes, either a spark or if it comes in contact with an object heated up to burning temperature. Gasoline vaporizes at 120 to 125 degrees of temperature and that vapor will ignite from the spark, but the solid liquid content itself will not ignite unless brought in contact with the flame or a body heated up to burning point.

"Q. What degree of temperature is the burning point?
"A. Heat that would burn wood, cloth or something like that.

"Q. Do I understand you to mean that burning point is where the article heated, if placed in contact with a piece of wood, it would burn it?
"A. Yes, sir, would catch on fire."

Cross-examined:

"Q. That means practically red hot?
"A. Yes, sir, practically ᐧ red hot to make it ignite.
"Q. You said something about a spark. As gasoline vaporizes, if there were two insulated wires (means uninsulated, no doubt) that should come in contact with each other and produce a spark, would that set it off?
"A. Yes, sir."

Hearne says (Trs. page 23): "A spark is necessary to ignite gasoline or the vapor from it." Further:

"Q. Would you say that if that exhaust pipe was almost red hot and should come in contact with that vapor that it would explode?
"A. Not unless a jar or something was dropped on the exhaust pipe, causing a spark.
"Q. Now, if this gasoline that has been shown here had poured on this exhaust pipe and no explosion or no ignition had taken place and you had a live wire in the car, exposed wire, and you stepped on the running board of the car and it immediately caught fire, what would you say caused the fire?
"A. I couldn't say—there would be two reasons for it igniting, there could be two causes.
"Q. What would they be?
"A. The wire coming in contact with this ground and, second, the gasoline falling on the exhaust pipe."

Grigsby says to the best of his knowledge gasoline will not ignite on exhaust pipe.

Joe Leiber (garage mechanic with eighteen years' experience) says (Trs. page 26):

"Q. Will gasoline explode or ignite on an exhaust pipe?
"A. To my certain knowledge it will not.

"Q. Your testimony is that gasoline will not ignite on hot iron?
"A. No, sir."

This witness offered to prove this to the District Judge, who, however, did not accept the offer.

G. B. Kelly, automobile mechanic with three years' experience, says (Trs. page 34):

"Q. Will hot iron set gasoline afire?
"A. No, not in my experience.
"Q. Will an exposed electric wire light a cable—set gasoline on fire?
"A. When it is vaporized, yes, sir."

On cross-examination:

"Q. Gasoline that falls from the tank on a car will vaporize?
"A. Yes, sir."

It is not clear whether Leiber or Kelly kept in mind the distinction between liquid gasoline and the vapor therefrom and meant that neither, or only the former, would not ignite from hot iron.

On the question whether the wire was insulated the testimony is as follows:

Grigsby says (p. 12) that Kelly said he had a short; told him this after the fire, but don't remember how long after.

Price says (p. 31) that right after the fire Kelly told him he had had an exposed wire, but don't know whether he had one then or not. He goes on.

"Q. Did you see any exposed wire in the car?
"A. Yes, sir, I saw the cable exposed.
"Q. That is the strongest wire in the car?
"A. Yes, sir.
"Q. And the insulation had become worn?
"A. The tape had become worn and exposed."

Kelly says (page 13):

"Q. It has been stated here by Grigsby that you had a short on that car?
"A. I had it at one time—the cable cell ᐧ

had been rubbed off—but it had been re-taped."

He says further (page 15):

That his lights were in good order; that if there were a short it would dim them down but that they were working all right and that the ignition was in good order. He admits on cross-examination that he don't know whether he had a short or not and don't know whether the batteries were discharging or not.

Defendant's counsel argues that as the fire did not start till Grigsby stepped on the running board, this shows it must have been produced by the spark of a short circuit. But it took some time for the gasoline to run down and become vapor-ized—perhaps no longer than was required for Grigsby to step to the running board.

Of course, the gasoline itself could not run up the exhaust pipe and reach the point where it becomes red hot, but the exhaust pipe where the gasoline could reach it could be hot enough to vaporize it and the vapor could reach the red hot point, if any. If so, we believe the vapor would be ignited and would in turn ignite the gasoline.

On the whole the evidence convinces us that the fire could have been started by either one of the causes respectively ad-vanced. But it leaves us uncertain as to which did start it.

Now where a crucial question of fact is left uncertain the decision must be against the party carrying the burden of proof. Defendant's counsel cites: Dickman vs. R. R. Co., 40 La. Ann. 787, 5 South. 76; Clemants vs. La. Electric Light Co., 44 La. Ann. 692, 11 South. 51, in support of the proposition that:

"When the action of both parties must have concurred to produce the injury, it develops upon the plaintiff to show that he was not himself guilty of negligence."

But in Boutte vs. N. O. Terminal Co., 139 La. 945, 72 South. 513, the court says:

"The defendant's plea of contributory negligence, however, is a special defense; the burden of proof of which is shifted to the defendant when the plaintiff proves prima facie that the injury resulted from defendant's negligence."

It cites several decisions in support of this proposition, amongst which is Buech-ner vs. City of N. O., 112 La. 599, 36 South. 603.

In that case the court discusses at con-siderable length the question of the burden of proof as to contributory negligence. It admits that some of the Louisiana decisions or dicta were to the contrary, but states that the uniform jurisprudence of the United States Supreme Court is that the burden is on the party making the plea and that bench says the same rule pre-vails in England and in twenty states of the Union.

So it adopts that view as the correct one and expressly overrules all Louisiana decisions or dicta to the contrary.

The burden being on defendant and it having failed to establish its plea, there must be judgment against it.

Kelly says the car had been used thir-teen months; had been driven five or six hundred miles a week and was in good running order.

Foster says, basing his opinion on the number of cars he had sold for plaintiff,

that it was worth approximately three hundred and seventy-five dollars.

C. W. Price says from outward appearance the car seemed in bad condition; that he wouldn't have given one hundred and seventy-five dollars for it and not that much without examination. He does not say he saw it before the fire.

An average between $175.00 and $375.00 is as close an approximation as we can make.

It is accordingly decreed: That the judgment of the lower court be reversed and that plaintiff have judgment against defendant for two hundred and seventy-five dollars, with 5% per annum interest from the time this judgment becomes final, and costs of both courts.